# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CANNON, Minors.

UNPUBLISHED
July 25, 2017

Nos. 336413; 336414
Kent Circuit Court
Family Division
LC Nos. 14-052762-NA;
14-052763-NA

Before: SAWYER, P.J., and HOEKSTRA and BECKERING, JJ.

PER CURIAM.

In this consolidated case, respondent-father and respondent-mother appeal separately as of right the trial court's order terminating their parental rights to the minor children under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist) and MCL 712A.19b(3)(g) (failure to provide proper care and custody). We affirm.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

Mother is the biological parent and father is the legal parent of the two minor children.[1] At the time of the children's removal, father was homeless and living in downtown Grand Rapids, Michigan, and mother was in an abusive relationship with another man. The Department of Health and Human Services (DHHS) filed a petition for removal of the children from mother's house after becoming aware that police had responded to mother's home multiple times for incidents of domestic violence while the children were home.

At the October 2014 adjudication hearing, Kayla Coombs, a foster-care worker from Catholic Charities of West Michigan assigned to the case for both children, testified that father's barriers to reunification with the children were substance abuse, stable housing, employment, parenting skills, and emotional stability. She testified that mother's barriers to reunification were substance abuse, emotional stability, domestic violence issues, parenting skills, and stable housing. Coombs also testified that the children were placed together in a licensed foster home.

---

[1] Father signed an affidavit of parentage during the course of these proceedings.

-1-

The record indicates that father and mother made little progress early on. Father resolved his homelessness by moving in with his new girlfriend, Anita Hernandez, who lived in housing deemed appropriate for the children. Hernandez became involved in father's treatment plan, but her participation remained sporadic at best. Father continued to test positive for THC, the main ingredient in marijuana and, although he received multiple referrals for substance abuse and anger management counseling, he attended few, if any, and in the opinion of one of his caseworkers[2] father did not seem to benefit from the sessions he did attend. Father completed a parenting class, but was discharged from another because of lack of attendance.

Similarly, mother was referred to multiple counseling programs for her substance abuse, domestic violence issues, and parenting skills, but missed a number of appointments. She completed one parenting class but was discharged from another due to nonattendance. She also tested positive for marijuana use on a few occasions. Early in 2015, police arrested mother for creating a disturbance at a bus stop, where she was arguing and fighting with people. When police arrived, she was holding a beer can in her hand and appeared "highly intoxicated." Police arrested mother after she failed their sobriety tests, and she spent two days in jail. According to her caseworker, domestic violence continued to be mother's most serious barrier to reunification. The caseworker told the court that during the reporting period from January 2015 to March 2015, mother had "run-ins" with her abusive ex-boyfriend multiple times. One such incident resulted in an episode of domestic violence that left mother with a black eye. Mother was "pretty intoxicated" during this incident. In addition, mother was discharged from the YWCA domestic violence counseling program due to nonattendance.

As 2015 wore on, both parents appeared to make progress toward removal of their respective barriers to reunification with their children and eventually were allowed unsupervised parenting time. At the June review hearing mother's caseworker testified that, although domestic violence continued to be a problem,[3] mother was "very active" in her treatment plan and was doing "very well" overall. At the September review hearing, the caseworker reported that mother was making progress on her treatment plan, that she had completed all of the parenting classes to which the agency had referred her, demonstrated emotional stability, obtained stable housing, and had all negative drug screens during that period. Additionally, when mother's abusive ex-boyfriend showed up at mother's apartment, she called the police and had him served with the PPO. With regard to father, the caseworker reported that he was appropriate with the children during supervised parenting time and that he had tested negative for drugs during the reporting period. Nevertheless, he was still having angry outbursts, including outbursts toward the foster-care worker, the children's attorney, and the foster parents. Despite the parents' progress, the caseworker recommended changing the goal for both parents from

---

[2] Three foster-care workers were involved in this case: Coombs, Brooke Lindley, and Marie Burns. Because Coombs was promoted to supervisor and supervised the workers assigned to the children at issue in this case, she could provide a measure of continuity and familiarity. For this reason, she was the agency representative who testified at the termination hearing.

[3] Mother obtained a personal protection order (PPO) against her abusive ex-boyfriend, but refused to have him served with it.

reunification to termination of parental rights and adoption because it had been over a year since the children's removal and they needed permanency. Nevertheless, the caseworker's recommendation changed when the parents continued to show progress during the next 90-day review period. At the December 2015 permanency planning hearing, the caseworker stated that the parents had made "good progress" overall on their treatment plan, and recommended that the goal be changed back to reunification.

Things slowly unraveled for the parents in 2016. In January 2016, police arrested father for choking mother, and in April, he pled guilty to assault by strangulation and received a sentence of 23 months' imprisonment.[4] Father's earliest release date from prison is February 27, 2018, and his maximum release date is March 29, 2026. The caseworker told the court that, after father went to prison, Hernandez stopped participating in the treatment plan, despite the caseworker asking her to continue. Mother, on the other hand, continued to progress and the caseworker told the court that mother had resolved the problems that had brought the children into foster care. At the May 2016 review hearing, the caseworker opined that termination of mother's parental rights was not in the best interests of the children because the children had a strong bond to mother and mother had rectified all of her barriers.

Two incidents changed the caseworker's opinion. In June 2016, mother, the children, mother's new boyfriend, and mother's sister were camping. Mother's sister stole mother's car and left mother and the rest of the party stranded at the campsite. The children's foster parents had to pick everybody up from the campsite. The caseworker was concerned that mother's sister was at the campsite because mother had a PPO against her sister. After the incident, the caseworker discussed with mother that it was not appropriate for her to have the children around people against whom she had a PPO.

In July 2016, mother was involved in a motor vehicle accident in which she collided with another vehicle in downtown Grand Rapids, Michigan. Mother had both children in the vehicle with her, as well as her sister and her abusive ex-boyfriend. There was damage to both vehicles. Mother lied to the children and told them that she spoke to the police and that it was okay for her to leave the scene. She then drove the car, with the other occupants, to a friend's house where she removed the license plate from her vehicle. Mother did not report the incident to her caseworker or the police. The next day, mother was driving her vehicle and the police pulled her over because they suspected her in the hit and run accident from the night before. Mother appeared intoxicated. Police officers performed a preliminary breath test, which revealed that mother had a blood alcohol content of 0.16%. Mother also failed the sobriety tests that police officers gave her. Mother was arrested. At the time, mother's children were at her apartment with her sister. The caseworker testified that she considered mother's sister a risk to the children, even though she never "harmed" them, because of the risk mother's sister posed to mother and because of mother's PPO against her sister.

---

[4] While father was out of jail awaiting sentencing, he tested positive for drug use in April, after having tested negative for nearly a year.

-3-

Subsequently, the caseworker recommended that the goal change again from reunification to termination of both parents' rights and adoption of the children. She opined that termination of both parents' rights at this point was in the best interests of the children because more than two years had passed since the children's removal from mother's custody, and the children needed permanency. Accordingly, petitioner filed a supplemental petition seeking termination of both parents' rights to the children pursuant to MCL 712A.19b(3)(c)(*i*) and (3)(g).

The trial court held a two-day termination hearing in December 2016. Coombs, now a foster-care supervisor, testified that the children had been in foster care for a little over two years. She testified that father's barriers remained domestic violence, emotional stability, substance abuse, and parenting skills. Coombs opined that father had not rectified the barriers that brought the case about and that it would be at least six to nine months after his earliest release from prison before the children could be returned to his care. Regarding mother, Coombs stated that the children were removed from mother's custody due to concerns of domestic violence, substance abuse, emotional stability, housing, and parenting skills. Coombs stated that mother did not rectify the barriers of domestic violence, substance abuse, parenting skills, or emotional stability. However, mother did rectify the barrier of housing.

Regarding the children's best interests, Coombs testified that the children had been in a licensed foster home together since their removal in August 2014. Coombs stated that father and Hernandez married two days before the hearing, but the agency was not considering Hernandez as a relative for placement because there had not been enough time to evaluate her in the two days prior to commencement of the termination hearing. Another reason why the agency was not considering placement of the children with Hernandez was her "very inconsistent" participation with father's treatment plan. Coombs also noted that, even though there was a bond between father and the children, that bond had "thinned out" over the course of the case.

Mother also testified at the termination hearing, stating that she did not believe that she had issues with domestic violence or with men in general. She also testified that her sister was a "very safe person" for her and her children to be around, that she did not believe her sister was a bad influence on her or the children, and that she still saw her sister. Mother did not believe that she needed parenting classes, and she admitted to the continued use of marijuana.

Ruling from the bench at the conclusion of the hearing, the trial court found that the conditions that led to adjudication remained unresolved. Mother continued to be involved in domestic violence and to abuse drugs. She failed to visit her children on a regular basis, was intoxicated in their presence, and left them with inappropriate caregivers. Similarly, notwithstanding a period of apparent sobriety, father continued to abuse substances and failed to engage profitably in counseling for substance abuse, anger management, and domestic violence. Father was incarcerated at least until February 2018, possibly longer. Considering that Coombs estimated it would take six to nine months of engagement in a parent-agency treatment plan after father's release before reunification with his children is a possibility, that would mean two more years of foster care for children who have already waited a long time for permanence. Accordingly, the trial court found that clear and convincing evidence established grounds for termination of the parents' parental rights pursuant to MCL 712A.19b(3)(c)(*i*).

With regard to MCL 712A.19b(3)(g), the trial court found that father relied on Hernandez's housing, but had failed to move toward being able to provide proper care and custody for the children otherwise, and that mother had proven that she cannot "provide a safe, stable, non-neglectful home environment." Accordingly, the court found clear and convincing evidence that the parents had failed to provide proper care or custody for the children and that it was unlikely they would be able to do so within a reasonable time, given the children's ages. The court rejected father's suggestion to place the children with Hernandez on the ground of her noncompliance with the treatment plan, opining that the mere fact of father's marriage to Hernandez did not automatically qualify her as an appropriate relative placement.

During its best-interest analysis, the court discussed at length the parents' histories, unfavorable psychological evaluations, the children's ages, parenting techniques, domestic violence, strength of the bond between the children and the parents, visitation history, parents' involvement in questionable relationships, compliance with the treatment plans, the children's wellbeing, the possibility of adoption, and the children's need for permanence. The trial court found that there was a preponderance of the evidence to support terminating parental rights of both parents to the children. The court issued a corresponding order, from which mother and father now appeal.

## II. ANALYSIS

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been met by clear and convincing evidence. MCL 712A.19b(3); *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). Then, the trial court must find by a preponderance of the evidence that termination is in the best interests of the children. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews the trial court's determinations for clear error. *In re VanDalen*, 293 Mich App at 139. "A finding is 'clearly erroneous' if, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). The interpretation and application of statutes and court rules are reviewed de novo. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). We give deference to the "trial court's special opportunity to judge the credibility of the witness." *In re HRC*, 286 Mich App at 459.

### A. STATUTORY GROUNDS FOR TERMINATION

Father contends that the trial court erred in finding grounds to terminate his parental rights pursuant to MCL 712A.19b(3)(c)(*i*). We disagree.

A court may terminate a parent's rights under MCL 712A.19b(3)(c)(*i*) if 182 or more days have passed since issuance of an initial dispositional order and the court finds by clear and convincing evidence that "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time given considering the child's age." Father does not dispute that termination occurred more than 182 days after issuance of the initial dispositional order in this case. Rather, he contends that the only condition that led to adjudication was his homelessness, which he resolved when he moved in with Hernandez.

Father's assertion that housing was his only barrier to reunification is incorrect. Coombs testified at the adjudication hearing that, in addition to housing, father's barriers to reunification with his children were substance abuse, emotional stability, and parenting skills. Her testimony at the termination hearing indicated that these other barriers remained. Concerning substance abuse, Coombs testified that, although father experienced a period of negative drug tests, he tested positive again for marijuana in April 2016. With regard to emotional stability, she testified that father demonstrated a lack of emotional stability throughout the case, on one occasion becoming irate and yelling at foster-care worker Lindley, the children's attorney, and the foster parents. Moreover, at the time of the hearing, father was serving a prison sentence for assault by strangulation for choking mother. Finally, Coombs testified that, although petitioner referred father to multiple parenting classes throughout this case, and he did complete one class, he was discharged from other parenting skills classes due to nonattendance. Thus, although the record shows that father experienced periods of improvement, even progressing to unsupervised visits in December 2015, it also shows that his barriers—other than perhaps housing—remained essentially the same from the start of the case until termination. The conditions that led to father's adjudication continue to exist, and there was no reasonable likelihood that father would rectify them within a reasonable time, considering the children's ages. Accordingly, we are not left with "a definite and firm conviction that a mistake has been made," *In re HRC*, 286 Mich App at 459, with regard to the trial court's finding that MCL 712A.19b(3)(c)(*i*) provides statutory grounds to terminate father's parental rights.

Father also contends that the trial court erred in finding clear and convincing evidence to terminate his parental rights pursuant to MCL 712A.19b(3)(g).[5] Mother joins father in this issue. Mother does not argue that the trial court erred in finding that she failed to provide proper care and custody for the children and that she would not be able to provide such care and custody within a reasonable time, given the children's ages. Rather, she argues in concert with father that termination was inappropriate because father's wife could have provided proper care and custody of the children at the time of the termination hearing. Mother "extrapolates from" the Michigan Supreme Court's statement in *In re Mason*, 486 Mich 142, 163; 782 NW2d 747 (2010), that "a child's placement with relatives weighs against termination under MCL 712A.19b(6)(a), [6]" to contend that "if one parent provides an appropriate relative placement for their mutual children, there are no grounds for termination of the second parent's rights."

Under MCL 712A.19b(3)(g), termination is proper when "[t]he parent, without regard to intent, fails to provide proper care and custody for the child and there is no reasonable expectation that the parent will be able to" within a reasonable time. However, a parent may

---

[5] Having determined that the trial court did not clearly err in finding clear and convincing evidence of statutory grounds to terminate father's parental rights pursuant to MCL 712A.19b(3)(c)(*i*), we need not address termination pursuant to MCL 712A.19b(3)(g). MCL 712A.19b(3); *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012). However, we will address father's argument because it is the basis for mother's sole challenge to the trial court's termination of her parental rights.

[6] This provision is currently numbered MCL 712A.19b(8)(a).

provide proper care and custody for the children by voluntarily placing them with an appropriate relative during their incarceration. *In re Mason*, 486 Mich 143, 163, 165; 782 NW2d 747 (2010). *Mason* provides that "a child's placement with relatives weighs against termination under MCL 712A.19b(6)(a) [now, § 19b(8)(a)], which expressly establishes that, although grounds allowing the initiation of termination proceedings are present, initiation of termination proceedings is not required when the children are 'being cared for by relatives.' " *Id*. at 164. Where the court decides to order the initiation of termination proceedings, children's placement with relatives is "an explicit factor to consider in determining whether termination [is] in the children's best interests[.]" *Id*. The definition of "relative" for purposes of placement includes "stepparent." MCL 712A.13a(j).[7]

Respondent parents base their argument regarding termination pursuant to MCL 712A.19b(3)(g) on the erroneous assumption that mere placement of the children with a relative is sufficient to forestall or halt termination proceedings. Although the placement of children with a relative allows the court some discretion in ordering initiation of termination proceedings when the children have been in foster care for 15 of the last 22 months, it does not prohibit the court from proceeding with termination anyway. MCL 712A.19b(8)(a). Further, prior relative placement does not factor into the trial court's determination of whether clear and convincing evidence establishes a statutory ground for termination, but is one of several factors the court weighs when determining whether termination of parental rights is in a child's best interests. *Mason*, 486 Mich at 164. In addition, contrary to father and mother's assumption, the trial court is not obligated to place children with a relative; "the trial court may terminate parental rights in lieu of placement with relatives if it finds termination is in the child's best interests." *In re Olive/Metts Minors*, 297 Mich App 35, 43; 823 NW2d 144 (2012).

The children in the instant case had been placed with an unrelated foster-care family for more than two years when the trial court authorized petitioner to file a supplemental petition requesting termination. Since father had not placed the children with a relative prior to the termination hearing, the court was not obligated to factor relative placement into its best-interest analysis. Nevertheless, the court specifically addressed the possibility of placing the children with Hernandez, concluding that the facts of this case did not indicate that Hernandez would be an appropriate relative placement for the children. The record supports the trial court's decision. Hernandez was sporadic with her participation in the treatment plan and with visits, and she stopped participating in the treatment plan altogether after father's incarceration, even though the foster care workers invited and encouraged her to continue participating. Apart from evidence indicating that she had appropriate housing, no record evidence indicated that Hernandez was in

---

[7] During the termination hearing, Coombs read into the record an older version of the statute that did not include stepparents as relatives for purposes of placement, and father relies on the same version in his brief to this Court. However, 2015 PA 228 added stepparents to the definition of "relatives," effective December 17, 2015, and was in effect when father married Hernandez on December 5, 2016, two days before the termination hearing. Further, it is clear from the record that the trial court did not reject father's argument on the ground that Hernandez was not a relative, but because nothing indicated she was an appropriate placement for the children.

a position in terms of skills, finances, health, or disposition to provide proper care and custody for the children while father was incarcerated for at least another year. Further, for the reasons discussed below, the trial court found that termination of the parents' rights was in the best interests of the children. At "trial court may terminate parental rights in lieu of placement with relatives if it finds termination is in the child's best interests." *Olive/Metts Minors*, 297 Mich App at 43. Accordingly, we cannot say that the trial court clearly erred by finding clear and convincing evidence to terminate both parents' rights pursuant to MCL 712A.19b(3)(g). Only one ground for termination is required. MCL 712A.19b(3);

## B. BEST INTERESTS OF THE CHILDREN

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). In determining the children's best interests, the trial court may consider the children's bond to their parents; the parents' parenting ability; the children's need for permanency, stability, and finality; and the advantages of a foster home over the parent's home. *Olive/Metts*, 297 Mich App at 41-42. The trial court may also consider the children's potential for adoption. "[A] child's placement with relatives weighs against termination[.]" *Id.* at 43 (quotation marks and citation omitted). "[T]he fact that the children are in the care of a relative at the time of the termination hearing is an explicit factor to consider in determining whether termination was in the children's best interests[.]" *Id.* (quotation marks and citation omitted). "A trial court's failure to explicitly address whether termination is appropriate in light of the children's placement with relatives renders the factual record inadequate to make a best-interest determination and requires reversal." *Id.* (citation omitted).

Father and mother contend that termination of their parental rights was not in the best interests of the children. Specifically, they argue that the trial court erred in determining that the children's well-being in foster care supported termination because the foster family fraudulently used a bridge card belonging to mother's sister, was under investigation for their care of another foster child in their home, and allowed mother unauthorized visits with the children.

Coombs testified at the November 2, 2016 permanency planning hearing that the agency investigated allegations that the foster parents had used a bridge card belonging to mother's sister and determined the allegations to be true. The information was turned over to the attorney general. However, the attorney general merely required the foster parents to pay the money back to the State and did not file criminal charges against them. The agency also spoke with the foster parents and mother regarding the unapproved visitation. Coombs testified that she, the CASA,[8] and the parents' caseworker at the time all felt that there were no concerns regarding the health,

---

[8] Court Appointed Special Advocates are trained volunteers appointed by the court to speak up for the best interests of abused, neglected, or abandoned children. According to their website, CASA volunteers "advocate for safety, permanence and well-being for children through independent recommendations." See http://www.michigancasa.org/ (accessed June 19, 2017).

safety, and welfare of the children due to the incidents. The trial court's ruling reveals that the trial court was aware of these allegations and factored them into its best-interest analysis.

In addition, the trial court considered the parent-child bond, the parents' parenting ability; the children's need for permanency, stability, and finality; and the children's wellbeing in foster care and the possibility of adoption. The court found the parents to have engaged the children appropriately during supervised parenting visits, but noted that mother tended to make poor decisions about whom to allow around the children during unsupervised visits. Although the parent-child bond was initially strong for both parents, the court heard evidence that it weakened significantly during the last year due to father's incarceration and mother's missing parenting-time visits and putting the children in unsafe situations. The court noted that the parents continued to engage in domestic violence and questionable, and in mother's case potentially hazardous, relationships. Regarding the children's need for permanence, the court noted that they had "waited a long time." The trial court addressed the advantages of the foster home and the potential for adoption. At almost every hearing, a foster-care worker testified regarding the children's wellbeing while in foster care, stating that the children were doing great in foster care, were excelling in school, were up-to-date with their medical appointments, and were progressing in their development.

On this record, and mindful of our deference to the "trial court's special opportunity to judge the credibility of the witness," *In re HRC*, 286 Mich App at 459, we cannot say that the trial court clearly erred in weighing the evidence and concluding that termination of the parental rights of father and mother was in the children's best interests. The trial court properly considered and analyzed the best interest factors, as well as other record evidence, before reaching a conclusion that is supported by a preponderance of the evidence. Therefore, we are not "left with a definite and firm conviction that a mistake has been made." *In re HRC*, 286 Mich App at 459. Accordingly, we affirm the trial court's order terminating the parental rights of father and mother.

Affirmed.


/s/ David H. Sawyer
/s/ Joel P. Hoekstra
/s/ Jane M. Beckering